J-A25028-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LEONARD PASINSKY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| REBECCA MAHOVSKY | : | |
| | : | |
| Appellant | : | No. 422 WDA 2022 |

Appeal from the Order Entered March 24, 2022
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  FD-17-0h08554-004

BEFORE:  KUNSELMAN, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY NICHOLS, J.:          **FILED: NOVEMBER 29, 2022**

Rebecca Mahovsky (Mother) appeals *pro se* from the order granting her partial physical custody and granting Leonard Pasinsky (Father) primary physical custody and sole legal custody of their minor child P.R.P. (Child), born in 2016.  Mother argues that the trial court abused its discretion in awarding Father primary physical custody and sole legal custody.  Mother also claims that the trial court erred by denying her petitions for special relief and for contempt.  We affirm.

We adopt the facts and procedural history set forth in the trial court's opinion.  **See** Trial Ct. Op., 5/16/22, at 1-8.  Briefly, the parties, who have never been married, have been engaged in custody litigation since July 27, 2017.  On February 13, 2019,[1] the parties entered into a consent order which

_____

[1] A copy of the consent order was filed and docketed on February 14, 2019.

provided that both parents shared legal custody of Child and physical custody alternating on a weekly basis. The order further provided that the parties would exchange custody approximately halfway between the parties' residences, and that each party would have a video chat or phone call with the Child once per day when the other party had custody of Child. Mother also agreed she would relocate from Erie County to Allegheny County by October 15, 2019. The parties subsequently amended this consent order several times.[2]

On October 22, 2020, Father filed a petition to modify custody, seeking primary physical custody of Child. The parties subsequently filed several pleadings, including Mother's petition for special relief, which requested that the trial court order Child to attend therapy, and Mother's petition for contempt, which alleged that Father violated the custody order by interfering with Mother's daily phone calls with Child. Father filed a Protection From Abuse (PFA) Act[3] petition on behalf of Child alleging that Mother's paramour

_____

[2] Mother did not relocate to Allegheny County by the deadline set forth in the February 13, 2019 consent order. On December 12, 2019, Mother and Father entered into a consent order (which was filed and docketed on December 13, 2019) which amended the February 2019 consent order in part. Custody exchanges were changed to curbside at Father's residence with Mother providing all transportation. Consent Order, 2/13/19, at 2 (unpaginated). Additionally, Mother agreed to pay $1,000 for Father's attorney's fees to resolve Father's pending petition for contempt. *Id.* As of the 2022 custody hearings, Mother still resides in Erie County. *See, e.g.*, N.T., 2/16/22, at 327, 331.

[3] 23 Pa.C.S. §§ 6101-6122.

had hit Child while he was in Mother's custody. On January 11, 2022, the trial court issued a temporary PFA order which granted Father sole physical custody and prohibited Mother from having contact with Child. The parties agreed to consolidate the final PFA hearing with the custody hearing.

The trial court held hearings on February 16, 2022 and March 8, 2022. The trial court heard testimony from several witnesses, including Father and Mother. During the first hearing, the parties resolved Father's PFA petition by entering into an agreement stating that Mother's paramour would not have contact with Child. The trial court issued an order memorializing the parties' agreement. At the conclusion of the second hearing, the trial court placed its findings on the record. N.T., 3/8/22, at 143-60. The trial court ordered that, two weeks before Child begins attending school, Father would have primary physical custody and sole legal custody of Child and Mother would have partial physical custody every other weekend. *Id.* at 160-61. The trial court further ordered Mother to continue providing all transportation for custody exchanges. *Id.* at 161. The trial court also ordered Father to immediately give consent for Child to enroll in therapy. *Id.* The trial court denied Mother's petition for special relief and her petition for contempt.[4] *Id.* at 162-63. The trial court

---

[4] The trial court noted that the parties had previously disposed of Father's PFA petition by agreement and order. N.T., 3/8/22, at 160.

reduced its final custody order to writing, which was dated March 11, 2022, and entered on March 24, 2022.[5]

Mother contemporaneously filed a timely notice of appeal and a Pa.R.A.P. 1925(a)(2)(i) statement of errors complained of on appeal on April 11, 2022. Mother also filed a motion for reconsideration on April 12, 2022. That same day, the trial court issued an order indicating that Mother's motion for reconsideration was null because more than thirty days had elapsed from the date that the trial court entered its order.[6] The trial court also filed a Rule 1925(a) opinion addressing Mother's issues.

On appeal, Mother raises the following issues for our review:

1. Whether the trial court committed an error of law and/or abused its discretion based on fact and law when they granted the [Father's] petition to modify custody on Mother's relocation?

2. Whether the trial court committed an error of law and/or abused its discretion in that the [Father's] residence is in the

---

[5] According to the trial court docket entries, the trial court served the parties with notice of the written order on March 24, 2022. **See** Pa.R.A.P. 108(a)(1) (providing that the date of entry of an order is the day the clerk of court mails or delivers copies of the order to the parties); **see also** Pa.R.C.P. 236. We have amended the caption accordingly.

[6] As stated above, the trial court's final custody order was entered on March 24, 2022, not March 11, 2022. Therefore, the trial court still had jurisdiction to rule on Mother's motion for reconsideration when she filed her motion on April 12, 2022. **See** Pa.R.C.P. 1930.2(b); Pa.R.A.P. 1701(b)(3)(i). However, a motion for reconsideration does not toll the appeal period unless the trial court grants reconsideration of its order. **See, e.g.**, Pa.R.C.P. 1930.2(b); **Karschner v. Karschner**, 703 A.2d 61, 62 (Pa. Super. 1997). Therefore, although the trial court erred in disposing of Mother's motion for reconsideration, it does not affect our jurisdiction.

best interest of [] Child considering the evidence presented in trial?

3. Whether the trial court committed an error of law and or abused its discretion in disregarding the testimony and evidence presented in trial regarding [] Child's medical care?

4. Whether the trial court committed an error of law and/or abused its discretion by granting [Father's] choice of school given the testimony and evidence presented in trial?

5. Whether the trial court committed an error of law and/or abused its discretion in making a determination that it was reasonable for [Mother] to provide all transportation for custody exchanges despite the testimony and evidence provided in trial?

6. Whether the trial court committed an error of law and/or abused its discretion in disregarding [Father's] testimony for his malicious motive for filing a false PFA [petition] and false police report against [Mother] in trial?

7. Whether the trial court committed an error of law and/or abused its discretion to disregard the testimony and evidence provided in trial by th[e trial] court's appointed psychological evaluator and deny [Mother's] petition for special relief?

8. Whether the trial court committed an error of law and/or abused its discretion to deny [Mother's] petition for civil contempt for disobedience of custody order given the testimony and evidence provided in trial?

Mother's Brief at 5-7 (unpaginated) (formatting altered).[7]

---

[7] Additionally, Mother alleges that the trial court was biased against her following a previous contempt hearing. Mother's Brief at 11 (unpaginated). Mother did not raise this claim before the trial court or in her Rule 1925(b) statement, therefore it is waived. **See** Pa.R.A.P. 1925(b)(4)(vii) (stating that "[i]ssues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived"), 302(a) (providing that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal"); **see also Crawford v. Crawford**, 633 A.2d 155, 159
*(Footnote Continued Next Page)*

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand.

*M.J.M. v. M.L.G.*, 63 A.3d 331, 334 (Pa. Super. 2013) (citation omitted).

Further, this Court has explained:

On issues of credibility and weight of the evidence, we defer to the findings of the trial court who has had the opportunity to observe the proceedings and demeanor of the witnesses. The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (citation omitted and formatting altered).

Initially, before addressing the merits of Mothers' claims, we must determine whether she has preserved her claims for purposes of appeal. In her brief, Mother cites case law in her discussion of the scope of and standard of review,[8] and she provides some citations to the hearing transcripts. However, she does not cite any legal authority in support of her arguments. Further, Mother's argument section consists of bald assertions alleging that

_____

(Pa. Super. 1993) (explaining that a claim of judicial bias must be raised at the earliest possible opportunity, otherwise it is waived).

[8] *See* Mother's Brief at 4-5 (unpaginated).

the trial court erred by awarding Father primary physical custody and sole legal custody, ordering Mother to provide all transportation for custody exchanges, denying Mother's petition for special relief regarding therapy for Child, and denying Mother's petition for contempt. Mother's Brief at 11-16 (unpaginated). Mother also challenges the trial court's weighing of the evidence and credibility determinations. *See id.* at 12-16 (unpaginated).

This Court has explained:

> Although this Court is willing to liberally construe materials filed by a *pro se* litigant, *pro se* status confers no special benefit upon the appellant. To the contrary, any person choosing to represent [herself] in a legal proceeding must, to a reasonable extent, assume that [her] lack of expertise and legal training will be [her] undoing.

*Wilkins v. Marsico*, 903 A.2d 1281, 1284-85 (Pa. Super. 2006) (citations omitted)).

Further, this Court has held that "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (citations omitted); *see also* Pa.R.A.P. 2119(a) (providing that the argument section of appellate brief shall contain discussion of issues raised therein and citation to pertinent legal authorities).

Here, because Mother failed to provide any relevant authority supporting her claims, we conclude that all of her issues are waived. *See W.H.*, 25 A.3d at 339 n.3.

In any event, even if Mother preserved her claims for review, she would not be entitled to relief. The trial court thoroughly addressed Mother's assertions regarding the custody order, her petition for special relief, and her petition to find Father in contempt. **See** Trial Ct. Op. at 10-22. Specifically, we note that the trial court found Father and Father's sister credible and found Mother not credible. **See id.** at 4, 7, 13-15, 21; **see also A.V.**, 87 A.3d at 820 (stating that we defer to the trial court's credibility determinations and "the parties cannot dictate the . . . weight" that the trial court gives to particular evidence). Because the trial court rejected Mother's testimony as not credible, we discern no abuse of discretion in the trial court's denial of the petition for contempt. **See** Trial Ct. Op. at 21; **see also Thomas v. Thomas**, 194 A.3d 220, 225 (Pa. Super. 2018) (explaining that this Court reviews a contempt order for an abuse of discretion). Likewise, we agree with the trial court that the terms of the custody order are in the best interests of Child, including the provision that Child receive therapy. **See** Trial Ct. Op. at 12-21. Therefore, even if Mother preserved her claims for review, we would affirm based on the trial court's analysis of these issues. **See id.** at 10-22.[9]

For these reasons, we affirm the trial court's order.

_____

[9] We note that the citation on page 13 of the trial court's opinion should read "**Commonwealth ex rel. E.H.T. v. R.E.T., Sr.**, 427 A.2d 1370 (Pa. Super. 1981)," the citation on page 14 of the trial court's opinion should read "**D.K.D. v. A.L.C.**, 141 A.3d 566, 575, 578-80 (Pa. Super. 2016)," and the citation on page 18 of the trial court's opinion should read "**J.M.R. v. J.M.**, 1 A.3d 902, 912 (Pa. Super. 2010)."

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/29/2022

# Allegheny County - Department of Court Records
## Civil Division - Filings Information

**County caseID:FD-17-008554**
**Case Description:Pasinski vs Mahovsky 004**
**Official Docket Entry, Sort By Document Number Ascending**

| Document Number | Filed Date | Title/Entry | Entry Classification | Filed By |
|---|---|---|---|---|
| 1 | 05/16/2022 | Opinion | Official Docket Entry | Kathryn MHens-Greco |

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

Leonard Pasinski,

Plaintiff,

v.

Rebecca Mahovsky,

Defendant.

OPINION

No.:    FD-17-08554-004

422 WDA 2022

FILED
22 MAY 16 PM 4: 13
DEPT. OF COURT RECORDS
CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

BY:

Honorable Kathryn Hens-Greco
440 Ross Street
Suite 535
Pittsburgh, PA 15219


COPIES TO:

Counsel for Plaintiff:

Eric J. Yandrich, Esquire
2101 Greentree Road, Suite A101B
Pittsburgh, PA 15220


Counsel for Defendant:

Jason R. Johns, Esquire
Anderson & Labovitz, LLC
428 Forbes Avenue, Suite 1901
Pittsburgh, PA 15219

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

Leonard Pasinski,

      Plaintiff,

    v.

Rebecca Mahovsky,

      Defendant.

No.: FD-17-08554-004

422 WDA 2022

## OPINION

HENS-GRECO, J.                                        May 16, 2022

In this matter, Defendant Rebecca Mahovsky ("Mother") appeals from this Court's Order, dated March 11, 2022, and entered that same day on numerous filings by her and Plaintiff Leonard Pasinski ("Father"); specifically, Father's Petition for Modification of a Custody Order, filed Oct. 20, 2022; Mother's Petition for Special Relief—Custody, filed Dec. 3, 2021; Mother's Petition for Civil Contempt for Disobedience of Custody Order, filed Dec. 3, 2021; Father's Petition for Civil Contempt/Special Relief, filed Jan. 10, 2022; and Father's Motion for Continuance (Protection from Abuse), filed Jan. 25, 2022.

This Court held two days of hearings. See Transcript of Testimony, dated Feb. 16, 2022 ("Tr. 1"), and Transcript of Testimony, dated Mar. 8, 2022 ("Tr. 2"). Afterward, this Court issued a final order on March 11, 2022.

On April 11, 2022, Mother appealed. For the reasons that follow, this Court's Order should be affirmed.

## RELEVANT PROCEDURAL AND FACTUAL HISTORY

Mother and Father are the biological parents of one minor child, P.R.P. (D.O.B.: Sept. 7, 2016), currently age 5 ("the Child"). See Custody Trial Stipulations ("Stipulations") at ¶¶ 1-2, Joint Ex. 1, Tr. 1 at 4-5. Neither has any other children. See Tr. 1 at 53-54. At the time of the

1

hearing, the parties had week-on, week-off physical custody with exchanges taking place on Saturdays at noon. See Stipulations at ¶ 4.

Originally, Mother and Father resided together in Allegheny County in the Glassport area, unmarried, beginning sometime in 2015. The relationship began to crumble. In late July of 2017, following an argument the content of which is disputed, Mother left, taking the Child to Millcreek, Pennsylvania. See Stipulations at ¶ 3; Tr. 1 at 32. She did not first tell Father or give him information on her whereabouts. See Tr. 1 at 32.

Father filed a complaint for custody of the child. See Pl.'s Compl. for Primary Physical and Shared Legal Custody of Minor Child, filed July 27, 2017. On August 1, 2017, Father then filed an Emergency Motion for Interim Custody and Special Relief, and the Court ordered that that Mother return the Child and that both Mother and Father follow the terms of a temporary order dated July 31, 2017. See Interim Order of Court, entered Aug. 1, 2017.

On August 29, 2017, the Court issued an Interim Order awarding Mother primary physical custody with partial custody for Father and shared legal custody. See Interim Order of Court, entered Aug. 29, 2017. Both parties were also ordered to register with Our Family Wizard ("OFW") and use it for communications. Id.

Over the next five years, Mother and Father traded numerous requests for Protection From Abuse orders, which were largely dismissed; petitions for special relief, emergency and otherwise; and requests that the other be held in contempt. They would enter into consent orders, only to violate them or to accuse each other of doing so. In other words, they have not been able to lay down their swords for the sake of the Child.

Without first coming to Court, Mother moved to Erie, Pennsylvania. She then filed petition asking for permission to do what she had already done—relocate—and she filed a counterclaim for primary custody. See Def.'s Compl. for Primary Physical and Legal Custody, filed Oct. 13, 2017; Def.'s Pet. to Permit Interim Relocation and for Special Relief, filed Oct. 26,

2

2017. She asked that the Court further accommodate her *fait accompli* by requiring custody exchanges at a halfway point in Grove City, Pennsylvania. Id.

Father responded that, contrary to Mother's representations, Mother did not in fact have a significant support system in Erie and that when the Child came from custody time with Mother, he appeared with bruises. See Tr. 1 at 51-53, 185, 224, 272; Tr. 2 at 30, 42, 44, 46. Mother stated that her father lives in the Erie area. Id. at 46. Father explained that Mother's sister, with whom Mother lived for a time, had a criminal record, id. at 127-28, but Mother claimed that these convictions were from fake arrests from the sister's undercover police work. See Tr. 2 at 88. In any event, Mother testified that she no longer has contact or information about her sister. Id. at 46. In response to Mother's effort to relocate, Father asked that he be given primary physical custody on a temporary basis. See Pl.'s Response to [Def.]'s Pet. to Permit Interim Relocation & For Special Relief & Defendant's Counter-Pet. for Special Relief, filed Oct. 26, 2017.

The issue of Mother's unilateral move permeated the case through the end of 2017 and 2018 until the parties entered into a consent order in early 2019 that allowed for shared physical custody and in which Mother agreed to return to Allegheny County and secure housing within six months. See Final Consent Custody Order of Court, entered Feb. 14, 2019.

It is undisputed that Mother never honored her agreement and the court order to return to Allegheny County. See Tr. 1 at 217, 338.

Meanwhile, custody exchanges in Grove City went badly, with Mother primarily creating problems and disruptions. See Tr. 1 at 222-23. During exchanges, Mother would take videos, conduct that escalated the tension. Id. at 37. Father asked his sister Heather to come to the exchanges. Id. at 37, 175, 180. In response to a request from Father, the Court ordered that exchanges take place immediately, within seconds, and without the parties' speaking. See Order of Court, entered Mar. 18, 2019.

The order went unheeded.

3

Mother would arrive and then sit in the car with the Child instead of turning the Child over to Father. See Tr. 1 at 37-38. For a time, the Grove City exchanges took place at a McDonald's, but Mother would take the Child inside instead of releasing him to Father, and she would whisper to the Child, causing him to cry. Id. at 39. See also Tr. 2 at 12-13. It got so bad that the McDonald's manager asked them to stop using the restaurant for interactions. Id. When confronted with video of Mother's bad behavior, Mother explained that while the video demonstrated her noncompliance with court orders, it did not show what came before with Father allegedly provoking her actions. See, e.g., Tr. 2 at 17-18. However, Father's sister, found credible by this Court, refuted Mother's testimony. See Tr. 1 at 183.

Sometimes, in the cold of winter, Mother would remove the Child's jacket and boots before allowing him to go to Father. Id. at 40-41, 182. Moreover, Mother was routinely late in bringing the Child to Father but would arrive on time when picking him up for her custody time. Id. at 177, 181-82, 187. Mother attempted to explain her tardiness as stemming from the Child's bathroom breaks or traffic. Id. at 341. Sometimes, Mother would refuse to take the Child's belongings with her for her custody time, and Father's sister would try to give them to Mother by placing them on the hood of Mother's car, but then Mother would just drive off with the boy's items on the hood. Id. at 181.

Despite the conflict with Father, Mother testified that she provides a wonderful home environment for the Child, stating: "I provide nothing but a nurturing, calm, gentle environment that will help [the Child] to do nothing but flourish." Id. at 271.

By December of 2019, the parties again entered into a consent order, this time agreeing to exchange the child every other Saturday at noon at the curbside at Father's home. See Consent Custody Order of Court, entered Dec. 13, 2019. This never went well either. Mother parks the car and sits in it for varying periods of time. See Tr. 1 at 175-78, 180. Father generally remains in the house because of the past conflicts. Id. at 179. Mother also keeps some of the Child's

4

belongings, which results in the Child arriving in an upset state. Id. at 180. Mother does abide by the order not to speak but finds ways to be provocative, such as setting up recording devices and staring at Father's home. Id. at 185.

Mother is aware that exchanges, by court order, are to take 30 seconds, but she testified that she cannot do the exchanges quickly because the Child is very emotional about the turnovers, and Mother also testified that she never really consented to the exchange rules; rather, she claims her lawyer consented to this order without asking Mother's permission or telling her first. See Tr. 1 at 340; Tr. 2 at 17, 22, 81-85. See also Consent Order, entered July 9, 2020. The late arrivals have sometimes interfered with activities the boy enjoys, like school events or racing. See Tr. 1 at 24-27. The Child loves racing, but Mother will not come to watch any of his races. Id. at 25-26, 48, 97-98, 184.

The animosity between the parties persisted, with accusations flying back and forth through legal filings claiming each was behaving badly at exchanges or allegedly interfering during phone calls to the other parent during their custody time. Father testified that when he calls the Child, he can sometimes hear her telling the Child to hang up. Id. at 22, 32. He stated that the Child has expressed fear of talking to Father when the Child is with Mother. Id. at 27. Mother's consent order requires her to leave the room during video chats between the Child and Father and vice versa. See Consent Order, entered July 9, 2020.

Father explained that he does try to encourage contact with Mother by various means; for example, during video chats, he gives the Child dinner, so that the Child will sit longer and pay better attention to his Mother. See Tr. 1 at 21-23, 54-56, 83. He stated he has never tried to prevent their relationship. Id. at 23, 82. Mother disputes Father's testimony and claims that he does indeed try to interfere in these calls and has shut off his phone to prevent her from calling the Child, an allegation which Father denied. Id. at 81-84, 280-82. The parties eventually agreed

to more specific terms for calls to the non-custodial parent during their respective custody times. See Consent Order of Court—Custody, entered Aug. 26, 2021.

Where, when and how the Child gets medical care is also a source of conflict between the parties. Father explained that Mother tries to switch the Child's primary care providers when the boy is in Erie and either gives those providers no contact information or incorrect contact information for Father. See Tr. 1 at 43-44, 203-04. Father's concern centered on Mother's rotating care facilities and providers for the Child by taking the Child to different urgent-care centers as well. Id. at 201-03. Father takes the reasoned position that the Child would have more continuity of care by going to his established medical providers in Allegheny County when possible. Id. at 201. However, Father does occasionally interfere. For instance, Father did postpone an ear surgery that Mother had scheduled for the Child's ear infections. Id. at 199. Father claimed that he wanted to get a second opinion although the Child did end up needing the surgery. Id.

On the other hand, there is a different perception by the parties about the Child's needs because it was clear to the Court that the Child has different problems when in the care of Father than when in the care of Mother. Father does not want the Child to have therapeutic intervention for behavioral problems because Father does not see the boy acting out abnormally in his care. Id. at 63, 207-11, 230. Mother sees the boy as having bed-wetting issues and wanted Father to use a bed alarm, but Father does not perceive the bed wetting as anything extreme or serious. Id. at 155-57, 212-16; Tr. 2 at 56. Father is encouraged in his views by the Child's teachers, who do not view the boy as having conduct problems, but he fails to adequately appreciate the impact on the Child of parental conflict. See Tr. 1 at 63-65, 210.

Father has stood in the way of the boy receiving counseling, Id. at 62, 85-86, 148, 155. However, this Court was convinced by the testimony that counseling would benefit the Child. The boy is living in an environment of high parental conflict, as professional witnesses also

6

observed, id. at 241, 247, and Father is not blameless for this situation although overall, this Court found Father to be the more caring and the more credible party. A behavior specialist who testified stated that she had seen the Child throw tantrums and scream and try to hurt himself in Mother's custody. Id. at 252. This witness credibly testified that Mother, to her credit, was receptive to coaching and interventions. Id. at 246-49.

Another arena for battle is that of school choice. Because of the Child's age, Father wanted to have the Child in full-time preschool, instead of every other week as the week-on, week-off custody schedule allowed, and this triggered the current petition for modification of the custody schedule. Id. at 10, 17-18. Due to the delays in reaching a hearing, this school decision now applies to the Child's kindergarten in August of 2022, for which Father has selected Mary of Nazareth Catholic School in White Oak, finding it to be of good academic quality. Id. at 20. He has agreed to pay the tuition. Id. at 19-20, 94. Father hopes eventually to send the boy to Serra Catholic, which he has identified as a good and nearby school. Id. at 72, 94. The Child has excellent school attendance when with Father. Id. at 71-72. Mother testified that she is not religious and does not want the boy in a Catholic school; rather, she prefers schools in the Erie region that she believes are also excellent. Id. at 134, 271-72, 276, 331; Tr. 2 at 60. Mother stated that she is a Methodist although she also testified that she does not go to church. See Tr. 2 at 61.

Communication is a great source of frustration and impedes medical and school-related decisions. The parties are supposed to communicate using OFW, but Mother tends not to open or respond to Father's messages. See Tr. 1 at 21, 60-61, 92-93. Mother claims that Father does not inform her of "anything" and writes aggressive messages on OFW. Id. at 284. She asserted that his messages were abusive and disgusting but was unable to produce a persuasive example. See Tr. 2 at 34-38. Ultimately, Mother agreed to respond to OFW messages within six hours although she has not regularly done so. See Consent Order, entered July 9, 2020. Father only communicates with Mother through OFW. Id. at 21, 47.

7

The disputes between the parents continued, and by the time of the hearing at issue, the following additional matters remained to be decided: Father's failure to consent to therapy for the Child, Father's purported continuing interference in phone calls between Mother and Child, Mother's alleged withholding of the Child during the 2021 Christmas holidays, and Father's request for a continuance in relation to a Protection From Abuse petition due to Mother's boss, James Cairns, attending exchanges and giving the Child a bloody nose. See Tr. 1 at 4-5, 89-90; Def.'s Pet. for Special Relief—Custody, filed Dec. 3, 2021; Def.'s Pet. for Civil Contempt for Disobedience of Custody Order, filed Dec. 3, 2021; Pl.'s Pet. for Civil Contempt/Special Relief, filed Jan. 10, 2022; and Pl.'s Mot. for Continuance (Protection From Abuse), filed Jan. 25, 2022.

These matters were addressed during the hearing before this Court on February 16 and March 8 of 2022, which resulted in the order now on appeal.

## MATTERS COMPLAINED OF ON APPEAL

On appeal, Mother raises 10 issues. See Notice of Appeal, filed Apr. 11, 2022 ("Concise Statements"):

1. Whether or not it was appropriate for this Court to base its determination on the Plaintiff's Petition to Modify on Mother's relocation to Erie County given that it had been five years since said relocation and since that time the parties have agreed to Mother's relocation and signed a consent order in February 2020. Therefore was it still appropriate for this Court to punish Mother for continuing to reside in Erie County and ignoring what is best for Paxton.

2. Whether or not it was appropriate for this Court to grant Father's Petition for Modification given that Father lives in a two bedroom house with an elderly uncle where Paxton does not have his own bedroom. Given that Father is unemployed and has an unstable environment and is unwilling to provide contact information for who is providing care/babysitting Paxton.

   Whether or not it was appropriate for this Court to only grant Mother partial custody given that Mother has her own house where Paxton has his own bedroom. Mother is employed and solely provides for Paxton. Mother provides a stable environment and resides in a very safe neighborhood where Paxton has many friends his age and will attend school with.

3. Whether or not it was appropriate for this Court to grant Father's legal custody given that testimony and evidence was provided to this Court proving Father's interference

8

with Paxton's proper medical care causing unnecessary harm. Despite Father's negligence and threatening behavior Mother has not fallen short in providing the appropriate medical care for Paxton up to and including shouldering all medical expenses.

4. Whether or not it was appropriate for this Court to grant Father school choice given that Father lives in the South Allegheny School District, which is not a high ranking school district. Father alleges that he will be moving in with his girlfriend to enroll Paxton in a private Catholic school despite the fact that Father is unemployed and that Mother does not practice or believe in the Catholic religion. Mother lives in one of the best school districts in Pennsylvania and testimony was provide and evidence submitted proving the ranking of the schools.

5. Whether or not it was appropriate for this Court to punish Mother and make her continue to provide all of the transportation given that the exchanges had previously taken place at a halfway location in Grove City and that Father's drivers license has been restored. Mother has never missed a custody exchange and has tirelessly shouldered the burden of transportation for over two years while Father has made no effort to help and has other people do the exchanges for him.

6. Whether or not it was appropriate for this Court to arrange Mother's pick up time on Fridays at 3:00 pm given that this will interfere with Mother's work and the amount of time it takes to travel. Father is unemployed and has the time and the flexibility to meet halfway at a more reasonable hour such as 6:00 pm.

7. Whether or not it was appropriate for this Court to arrange a holiday schedule that is very generalized and does not factor in the distance between the parties and the traveling time which ultimately causes extra trips for Mother and Paxton in a very short amount of time.

8. Whether or not it was appropriate for this Court to overlook Father's testimony for his malicious motive for filing a false PFA given that Mother had COVID and Father was unwilling to cooperate and pick up Paxton for Christmas. Also, given that Father was willing to drop the PFA once a consent order was signed to switch the custody exchange days from Saturday to Sunday.

9. Whether or not it was appropriate for this Court to deny Mother's Petition for Special Relief given that Mother had sought therapy for Paxton for over two years and that Father was unwilling to consent to any therapy. Also given that Father threatened Paxton's therapist which forced the session to stop. In addition, this Court's appointed psychological evaluator, Dr. McGroarty had stated that there should be no question with regards to Paxton receiving therapy.

10. Whether or not it was appropriate for this Court to deny Mother's Petition for Civil Contempt for Disobedience of Custody Order given that Mother provided testimony and submitted evidence to the court that proves Father's interference as well as purposeful alienation.

These contentions are without merit.

9

## ANALYSIS OF MOTHER'S CLAIMS
### Applicable Standards

As with any custody case, the paramount concern is the best interests of the children. See, e.g., D.K. v. S.P.K., 102 A.3d 467, 474 (Pa. Super. 2014); M.J.M. v. M.L.G., 63 A.3d 331, 334 (Pa. Super. 2013). The Legislature has set forth 16 factors for the trial court's consideration in analyzing those best interests, which are as follows:

> (a) **Factors.**--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.
>
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
>
> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.
>
> (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.
>
> (10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

10

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa. C.S. § 5328(a) (Factors to consider when awarding custody).

The factors governing a decision on relocation overlap somewhat. The factors governing relocation decisions are as follows:

[T]he court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

11

(8)  The reasons and motivation of each party for seeking or opposing the relocation.

(9)  The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10)  Any other factor affecting the best interest of the child.

23 Pa. C.S. § 5337(h) (Relocation Factors). The party seeking relocation bears the burden of proving that it will serve the child's best interests, and each party has the burden of proving the integrity of their motives in the decision. Id. at § 5337(i).

In reviewing a custody order, including one involving relocation, the appellate court's scope of review is of the broadest type, and the standard is whether the trial court abused its discretion. See D.K., 102 A.3d at 478. The appellate courts have held that they must accept findings that are supported by competent evidence. Id. Thus, the appellate court's role "'does not include making independent factual determinations.'" Id. (quoting J.R.M. v. J.E.A., 33 A.3d 647, 650 (Pa. Super. 2011)). See also, e.g., S.J.S. v. M.J.S., 76 A.3d 541, 547-48 (Pa. Super. 2013) (discussing standards in change-of-custody and relocation decision).

Additionally, "'with regard to issues of credibility and weight of the evidence, [the appellate court] must defer to the presiding trial judge who viewed and assessed the witnesses first-hand.'" D.K., 102 A.3d at 478 (quoting J.R.M. v. J.E.A., 33 A.3d 647, 650 (Pa. Super. 2011)). The court on appeal may reject conclusions of the trial court only where those conclusions involve an error of law or are unreasonable in light of the sustainable findings of the trial court. Id. See also, e.g., M.J.M., 63 A.3d at 334; S.J.S., 76 A.3d at 547-48.

**Specific Allegations of Error Addressed**

Mother first argues that this Court's overall ruling did not focus on the Child's best interests and was instead an effort to "punish Mother" for continuing to reside in Erie. See Concise Statements. To the contrary, this Court's final order reflected the Court's views on the

12

child's best interests. The Child has more stable and loving care with Father as his primary custodian, and the Child's conduct itself shows this. See Tr. 2 at 144-60. This Court noted that Mother's recalcitrance in remaining in Erie aggravated a bad situation, which is a reasonable characterization based on the record. Id. There was no credible evidence that Mother's relocation to Erie was a decision she made because of life-enhancing opportunities that would inure to the Child's benefit. She has built a life there, gaining her current, steady employment two and a half years into her stay, but even that work has created more disturbance for the Child, given that Mother's employer has come to exchanges and is now under a Protection from Abuse ("PFA") Order as to the Child.

The Superior Court rejected an argument like Mother's first contention in Commonwealth ex rel. E.H.T. v. R.E.T., Sr., 427 A.3d 1370 (Pa. Super. 1981). There, a mother appealed after a court awarded custody of her two children to their father. Id. at 1371. Prior to that, the mother had primary custody with father having scheduled visits. Id. On appeal, the mother contended that she was being penalized for her unilateral move with the children from Pennsylvania to North Carolina. Id. at 1371, 1374. The mother explained that the move benefited the children through enhanced educational opportunities and a nicer home, but these reasons were exposed as suspect. Id. at 1372, 1374-75. The appellate court emphasized that the mother's conduct was a direct and willful violation of a court order. Id. at 1374-75. The appellate court concluded that, as here, the trial court's decision was not a form of punishment, but rather, the conduct spoke to the mother's insufficient concern for the children's interests and her disrespect for the legal custody process that raised concerns about her parental ability. Id. at 1375-76.

Here, Mother left for Erie without seeking Court permission through a hearing. She then entered into a consent order to return to Allegheny County which gave her more than six months to make the adjustment back to this region. She chose to ignore the law, then court orders and her own word. While this did not control the outcome of the order now in question, Mother's

13

disrespect for the legal process mirrors her disrespect for her own Child's interests, which she submerges beneath her own desires to express anger at Father by whipping up discord. Examples include Mother's repeatedly disruptive conduct at custody exchanges, her undermining of the Child's relationship with his Father, her failure to communicate in a timely matter on OFW and her lack of regard for the Child's interests as expressed in her failure to attend even one of his racing functions, a source of joy to the Child. Thus, Mother's argument should be rejected. See also, e.g., In re Leskovich, 385 A.2d 373, 378 (Pa. Super. 1978) (parent's removal of the child to another location was "inconsistent with the orderly and impartial resolution of disputes concerning the custody of minors" and this "disrespect for the legal process" should bear on the assessment of her parental quality); D.K.D. v. A.L.C., 141 A.3d 566, 569, 578-80 (Pa. Super. 2016) (reversing decision allowing mother's relocation in part because mother moved without first having job prospects and nothing indicated she would alter her "ensconced pattern" of thwarting father's relationship with the child).

This Court also concluded that Mother lacks insight into her motivations and the impact of her conduct on the Child. She is only capable of seeing herself in glowing terms. She testified: "I believe that my parenting ability is excellent. Absolutely excellent. I mean, every parent has their faults but I live my life for my son. Every decision I make, everything I do is to benefit my son. I'm selfless." Tr. 1 at 272. She blamed most of the parties' problems on Father and was unable to identify any specific shortcomings of her own. See Tr. 2 at 57. The parties' actions do not bear out Mother's view.

Second, Mother makes a multi-part argument. She asserts that this Court erred in giving Father primary physical custody because Father lives in a two-bedroom house with an elderly uncle where the Child does not have his own bedroom and where Father is unemployed and provides an unstable environment. This, Mother contends, contrasts poorly with Mother's safe neighborhood where the Child has many friends and stability.

14

To begin with, Father unquestionably has extended family nearby, and the Child has friends and roots in his current area with Father. Id. at 50-51, 69-70. Additionally, Mother's argument on housing and employment is not legally relevant in a case such as this where both parties have the capacity to raise the Child in more than adequate circumstances. See, e.g., Roadcap v. Roadcap, 778 A.2d 687, 690 (Pa. Super. 2001) (reversing custody decision that had been in favor of father as wrongly based purely on the parents' relative finances). Accordingly, even if true, Mother's argument would be irrelevant in this case. As the Roadcap Court explained:

> [T]he law in Pennsylvania has long been that custody is not to be awarded merely on the basis that "a better home in physical aspects, or a higher standard of living can be provided elsewhere." *Commonwealth ex rel. Holschuh v. Holland–Moritz*, 448 Pa. 437, 292 A.2d 380, 384 (1972). Indeed, "[i]n a custody proceeding, the sole permissible inquiry into the relative wealth of the parties is whether either party is unable to provide adequately for the child; unless the income of one party is so inadequate as to preclude raising the children in a decent manner, the matter of relative income is irrelevant." *Brooks v. Brooks*, 319 Pa.Super. 268, 466 A.2d 152, 156 (1983).

Id.

Mother testified that her home has two bathrooms and a bedroom for the Child. See Tr. 1 at 265-66. Contrary to Mother's portrayal, Father testified that at Father's home, where he lives with his uncle, the Child has his own bedroom with two dressers and a desk. Id. at 118, 229. Additionally, Father and uncle also have their own bedrooms. Id. There was no credible evidence that the Child lives in decrepit circumstances with Father, and the courts have held that in a custody dispute, one parent's ability to provide "'somewhat better' living facilities should [be] given very little, if any weight." In re Pearce, 456 A.2d 597, 599-600 (quotation omitted). Hence, Mother's argument on housing in this case is without legal merit. See also Commonwealth ex rel. Lucchetti v. Lucchetti, 72 A.2d 617, 618 (Pa. Super. 1950) (having superior and private bedroom arrangements is not enough to form a basis for custody).

15

The remainder of Mother's contention is equally baseless. Mother testified that Father should work and instead lives for free, setting a bad example. See Tr. 1 at 302. She compared herself favorably by testifying that she is very stable with a full-time job and that her neighborhood is safe with many children in the vicinity and that she has extended family nearby. Id. at 271-72, 299-300.

Mother's testimony that Father's unemployment sets a bad example is unwarranted and unfair. As Mother knows, Father used to work as a brick mason but then became a licensed insurance agent. Id. at 104-05. He began working in insurance in 2009. Id. at 105. He testified that he has not sought other employment because while remaining with his current company, he receives residual commissions and that he is merely following medical advice in recuperating from spinal surgery. Id. at 14-15, 106-07. He plans to return to work after he is fully recovered. Id. at 15. The fact that he was living in his uncle's home, where he helps care for his uncle, without any rent or mortgage payments at the time of trial does not convert Father into a slacker with no work history who sets a bad example for his son. Id. at 118.

It is true that Mother does now work as an office manager at the Cairns Law Office in Millcreek, Pennsylvania. Id. at 272, 279. However, sometimes Mother has taken the Child with her to work. Id. at 49. Mother denied any romantic involvement with her employer, James Cairns, known as "Jimbo," although Jimbo Cairns has appeared more than once in the car with Mother at custody exchanges, as Father's sister attested. See Tr. 1 at 15, 183. Mother offered a very unavailing explanation on Jimbo's presence, claiming that he only came because at the time of the exchange, there was a bench warrant out for her arrest for child support. Id. at 14. In any event, Mother consented to cease all contact between the Child and Jimbo as part of a PFA filed by Father on the boy's behalf after the boy returned with a bloody nose after time with Jimbo. See Tr. 2 at 15-16; Tr. 1 at 4-5 (Stipulations), 163, 166, 190.

16

Mother still works for Jimbo. See Tr. 1 at 91, 272. The psychologist who testified observed that Mother tends to minimize or underreport problems, and to this Court, the interactions with Jimbo fall into that category. Id. at 158-90. See also, e.g., id. at 309-10 (wherein Mother testified that she only brought the Child to work a few times and that Jimbo was not there every time). Previously, Mother has held other jobs, such as working in a bar where she also brought the Child when he was a baby. See Tr. 1 at 67.

For these reasons, Mother's second argument that Father's current health-related unemployment creates a bad environment should be rejected.

Third, Mother contends that this Court erred in giving legal custody to Father to make medical decisions for the Child because of Father's alleged interference in the Child's proper care. It is in fact Mother who has engaged in greater interference in the Child's proper medical care. The evidence showed that medical care is a high-conflict subject between the parents. This Court heard evidence that both parents have interfered with the other's medical decisions, but in Father's case, it was more limited. Father takes the reasoned view that the Child is well served by maintaining continuity of care in his primary medical providers whereas Mother will shuffle the Child between physicians. Father did intervene when he learned Mother had scheduled an ear surgery and sought a second opinion although Mother's behavior does not help in that she tends to prevent Father from accessing information, which makes Father fearful. Overall, Father is the party who provides more stability in caring for the Child's medical needs. Therefore, Mother's argument fails.

Fourth, Mother contends that Father should not have been given the ability to choose the Child's school because the South Allegheny School District is not high ranking compared to the one where she lives and because the alternative that Father has chosen is a Catholic school and Mother does not practice Catholicism. This Court cannot conclude that even if Mother's school district is somewhat better, this factor alone would justify giving Mother legal custody.

17

Moreover, Mother's relocation was not based on the Child's education prospects. See, e.g., J.M.R. v. J.M., 1 A.3d 901, 912 (Pa. Super. 2010) (noting that a father's relocation was based on his own romantic interests and the availability of a potentially better school district was happenstance that did not require reversal of a ruling in favor of the other parent).

The fact that Mother is Protestant, and the school that Father has chosen is a private Catholic school, is of no moment. Many children attend private religious schools for the quality of the school more than for the religious training, and it was evident from Father's testimony that he keeps himself informed about the quality of the schools he selects. More importantly, barring some unusually adverse effect on the Child, it is not the province of the Court to compare and then choose between parents' religious faiths. See also, e.g., Stolarick v. Novak, 584 A.2d 1034, 1035-37; Tripathi v. Tripathi, 787 A.2d 436, 442 (Pa. Super. 2001) (finding that a custodial parent may be given the right to direct the religious education of a child even where that parent purportedly strays from strict adherence to the family's traditional faith).

Fifth, Mother argues that the Court erred in requiring her to continue providing all transportation for custody exchanges even though Father's driver's license, suspended for substantial time, was about to be restored. See Tr. 1 at 109. With the help of his sister, Father did meet Mother halfway at her request for a significant portion of the time in which she has lived in Erie. It is true that Father did lose his license for a time in connection to his being pulled over for driving under the influence of alcohol at a .08 blood alcohol level, an incident for which he was admitted to the Accelerated Rehabilitative Disposition program which prevented a conviction. Id. at 109-10. Father was honest about this misconduct, which has not recurred. Mother tried to capitalize on this event with numerous accusations of substance abuse by Father, but this Court specifically found that Father does not have a substance-abuse problem. See Tr. 2 at 155.

In any event, as to Mother's argument on transportation, it must be noted that it was Mother's conduct in making a unilateral move to Erie that necessitated the transportation that she

18

now complains of. Mother did request and was granted exchanges at a halfway point in Grove City for a time, but as recited above, Mother made those exchanges extremely upsetting for all and, therefore, they were moved to Father's house. It struck this Court as highly inequitable to force Father to accommodate Mother's move by having him to again drive to another location to suffer through these interactions. Additionally, under the new custody order, during much of the year when school is in session, Mother will only need to make the drive every other week.

Mother's sixth argument is related. She asserts that it was error to set Mother's pickup time at 3 p.m. on Fridays because it will interfere with her workday, and she again alleges error in the transportation arrangement as taking place in Pittsburgh. On the stand, Mother was asked if her work schedule with Jimbo Cairns was flexible, to which she replied: "Relatively flexible. We started a rotation shift. It's optional, it's not required, but it's a 7:00 to 4:00 shift. I also have the option to occasionally, if I need to, to work from home." Tr. 1 at 273.

Because of Mother's own conduct and because her work schedule is flexible, this Court did not err in the arrangement for Mother's transportation for custody exchanges. As the Child begins full-time school in the Pittsburgh area, Mother may find the requirement less burdensome, and the Court has no doubt that she will seek modification if the schedule proves otherwise.

Seventh, Mother argues that this Court erred in establishing a holiday schedule that "is very generalized" and does not consider travel time. See Concise Statements. The Court's Order on holidays is standard and relates to six days in the year: Mother's Day, Father's Day, Easter, Thanksgiving and two days around Christmas. The Easter and Christmas holidays are divided in even and odd years. Moreover, some of those days to which Mother is entitled will inevitably fall during Mother's custody time, and some of the days owed to Father will inevitably occur during his custody time. For these reasons, Mother's contention that these six days in the year will be unduly burdensome is not persuasive. In any event, the parties are permitted to make modifications between themselves although the Court recognizes that to date, they have not been

19

able to cooperate, a pattern which Mother could help change. Mother's sixth and seventh arguments should be rejected.

Eighth, Mother argues that this Court overlooked Father's conduct over Christmas, when Mother had the Child and then developed COVID-19. She contends that this Court ignored Father's refusal to pick the child up and his purportedly malicious motive for seeking a PFA. During the hearing, the parties did testify about an incident that occurred over Christmas of 2021. Mother had the Child in her custody but notified Father that she had tested positive for COVID-19. See Tr. 1 at 53, 77-79, 231-32, 306-08, 324-25. Father was skeptical and asked for proof. Id. Mother wanted Father to pick up the Child, which he did not do. Id. See also Pl.'s Pet. for Civil Contempt/Special Relief, filed Jan. 10, 2022. Mother returned to work within a week but kept the Child for several weeks instead of returning the boy when she was recovered. See Tr. 1 at 53, 77-79, 231, 306-08, 324-25. In fact, this Court did not find Father's disgruntlement with the Christmas events substantial and, after discounting his complaints, denied Father's petition for contempt at the close of the hearing. See Tr. 2 at 15-16; Tr. 1 at 90, 164-65, 237-38. Therefore, with Father's petition denied, Mother has no reasonable grounds to raise the handling of the Christmas incident as error on appeal. The PFA that Mother raises was related to the conduct of Jimbo Cairns. Mother consented to it, and therefore, it is not a source of error.

Ninth, Mother contends that this Court erred in denying her Petition for Special Relief in which she sought therapy for the Child. During the hearing, Mother called attention to the Child's behavioral and emotional issues that she has experienced in her custody time. Mother also offered testimony that the Child would benefit from counseling but that Father was unreasonably withholding his consent. As discussed above, the Court was convinced that counseling could benefit the Child, given the high-conflict parental discord and the behavioral and emotional issues the Child has exhibited during Mother's custody. In Mother's petition, she proposed that this Court order the Child to see a specific physician. Rather, this Court gave

20

Mother modified relief by ordering Father to immediately consent to the Child's therapy and parent coaching with Emily Wachter, an early intervention behavioral specialist with whom the Mother and Child have a rapport and whom Mother called to testify at the hearing. See Tr. 1 at 244-54. Accordingly, Mother is receiving the essence of what she sought per her hearing testimony, and the Court can find no error or prejudice to her in this result.

Mother's tenth and last argument is that this Court erred in denying her petition for contempt for Father's alleged disobedience of a custody order by willfully interfering with phone calls between Mother and the Child. This Court did not believe the testimony that Father interferes with these calls. Instead, the Court believed Father's testimony that he in fact encourages calls, including for example making sure the Child has dinner for video chats to help him stay focused on his interactions with Mother. It is within this Court's province to weigh and assess the credibility of the evidence. See, e.g., D.K. v. S.P.K., 102 A.3d 467, 478 (Pa. Super. 2014); S.C.B. v. J.S.B., 218 A.3d 905, 915-16 (Pa. Super. 2019) (finding that trial court was within its discretion in custody case to find that mother's testimony on matters such as injuries in the father's care were "exaggerated"). Because the Court did not find any credible testimony regarding Father's alleged interference, there is no error in the denial of Mother's petition.

## CONCLUSION

The Court's decision rests upon a complete review of the record and the Court's observation of the testimony. For the reasons set forth above, the Court remains convinced that the decision is in the Child's best interests and not "manifestly unreasonable as shown by the evidence of record." Robinson v. Robinson, 645 A.2d 836, 838 (Pa. 1994). See also, e.g., P.J.P. v. M.M., 185 A.3d 413, 418-19 (Pa. Super 2018) (finding that trial court's decision should be upheld where its findings were supported by the record and where its conclusions were not unreasonable). While the result is not in keeping with Mother's wishes, she still has substantial custody time with her son. In a custody case, the children's best interests must control, and "all

21

other considerations are deemed subordinate" to those interests. <u>Gerber v. Gerber</u>, 487 A.2d 413, 414 (Pa. Super. 1985).

For the foregoing reasons, the Order of this Court, entered March 11, 2022, should be affirmed.

_Kathryn Olens Oteco_____ J.

22